IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GALVESTON LFG, LLC, *et al.*,

                              Plaintiffs,                      OPINION AND ORDER

    v.

                                                       22-cv-538-wmc

BIOFERM ENERGY SYSTEMS, LLC,

                              Defendant.

---

      Plaintiffs Galveston LFG, LLC, Montauk Energy Holdings, LLC, and Montauk Renewables, Inc., (collectively, "Montauk"), brought this diversity action against defendant BIOFerm Energy Systems, LLC, ("BIOFerm"), for breach of contract, breach of warranty, and other causes of action under Wisconsin state law including violation of Wis. Stat. § 100.18, sometimes now referred to as Wisconsin's Deceptive Trade Practices Act ("DTPA"). *See* Mark Hinkston, Protecting Consumers in the Modern Age: Wisconsin's Deceptive Trade Practices Act, *Wisconsin Lawyer* (Oct. 2008) https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=81&Issue=10&ArticleID=1596.  Before this court is BIOFerm's motion to dismiss Count Six of Montauk's complaint, asserting a violation of Wis. Stat. § 100.18 under Federal Rule of Civil Procedure 12(b)(6).  (Dkt. #10.)  For the reasons discussed below, the court will grant this motion.

ALLEGATIONS OF FACT[1]

Galveston LFG owns and operates a gas processing facility in Galveston, Texas. Galveston LFG is a Delaware limited liability company with its principal place of business in Texas. Galveston LFG is a wholly owned subsidiary of Montauk Energy Holdings, a Delaware limited liability company, which, in turn, is a wholly owned subsidiary of Montauk Renewables, Inc., a Delaware corporation, both with their principal place of business in Pennsylvania. Montauk is an energy company specializing in processing landfill gas for beneficial use as a fuel. Defendant BIOFerm is a Madison-based, Wisconsin limited liability company that designs and manufactures biodigesters that convert organic waste into Renewable Natural Gas ("RNG"), with all of its members domiciled in Wisconsin. (Dkt. #1, at ¶ 5.)[2]

In developing a landfill gas processing facility near Galveston, Texas, Montauk decided on the so-called "Pressure Swing Adsorption" ("PSA") process to convert landfill gas. (Dkt. #1, at ¶ 16.) The PSA process uses a special adsorbent media to separate the gas species in landfills under high pressure, pushing the undesirable gases into pores of a molecular sieve media. Dropping the pressure, a vacuum then releases the undesired gases and regenerates the media, leaving purified RNG.

---

[1] The following facts are taken from Montauk's complaint. (Dkt. #1.) In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of" the non-movant. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017).

[2] With plaintiffs in Texas, Pennsylvania, and Delaware, defendants in Wisconsin and the amount in controversy far exceeding $75,000, this court has diversity jurisdiction over this case. 28 U.S.C. § 1332.

Montauk's complaint attaches exhibits showing BIOFerm advertisements of its PSA process offerings on its website, as well as touting proven products, assured quality, strong performance, and fair pricing. (Dkt. #1-3, at 5, 8 (Ex. A).) By August 11, 2017, Nadeem Afghan, President and CEO of BIOFerm, and Scott Hill, Galveston's Vice President of Engineering, were negotiating over possible biogas facility systems that Galveston might use. (Dkt. #1-5 (Ex. C).) A presentation from BIOFerm states that it provides a "Complete performance guarantee/warranty" for its PSA systems. (*Id.* at 5.) Montauk also alleges that BIOFerm represented its partner in the Galveston project would be Carbotech Gas Systems, Gmbh, ("Carbotech"), a German company that supplies activated carbons that are used as adsorbent media in the PSA process. Before reaching an agreement, Montauk alleges that their representatives observed a PSA processing facility in Guymon, Oklahoma, running on one of BIOFerm's systems, and that Afghan emailed Hill and Montauk's Chief Legal Officer offering a 24-month comprehensive warranty, agreeing that the plant would be free from defects in material and workmanship for a period of twelve months, and warranting parts for twelve months from the date of service or expiration of the plan warranty. (Dkt. #1-6 (Ex. D).)

The parties executed the contract on April 17, 2018, in which BIOFerm agreed to design and commission an RNG conversion facility for Montauk in exchange for $13,150,000.00. (Dkt. #1, at ¶ 32; dkt. #1-4 (Ex. B).) Work commenced on the project in late spring 2018, and Montauk alleges the parties agreed to a series of change orders during construction. For example, Montauk attached to its complaint a change order dated

3

April 14, 2019, in which provision and installation of support anchors for the equipment would be handled by BIOFerm instead of Montauk. (Dkt. #1-7 (Ex E).)[3]

Power was first applied to the system on August 20, 2019, although performance testing did not start until February 2020. Montauk alleges that the performance results did not meet what it understood to be the minimum contractually agreed requirements. Over time, Montauk allegedly discovered additional problems, including that the plates holding the media had been improperly welded by BIOFerm's subcontractor. In an April 21, 2020, memo to Montauk, BIOFerm recommended a fix, which entailed re-opening the PSA vessels, removing the previously installed media, properly welding the plates, then using a vacuum process to reinstall the media. (Dkt. #1-9 (Ex. G).) BIOFerm later reinstalled the media as proposed during a scheduled shutdown period in April 2020, except that Montauk alleges BIOFerm failed to replace all the media that it removed, causing continued performance problems with the RNG conversion project. Another problem Montauk alleges is that BIOFerm claimed the facility needed replacement blowers and parts, as seen in a January 20, 2020, purchase order, but refused to cover these costs. (Dkt. #1-8 (Ex. F).) Additionally, BIOFerm allegedly insisted that the contract warranty would expire August 19, 2020, one year after power was first applied, despite the delay in conducting preliminary testing and the performance problems that existed during the first several months. (Dkt. #1-10 (Ex. H).)

---

[3] Curiously, the parties' contract appears not to have any kind of integration clause disavowing reliance on past or future representations. (Dkt. #1-4.) However, that is not germane to the current motion.

In late 2021, Montauk sought the assistance of Carbotech as "the manufacturer of the media, to assist it with installation of new media and to assess whether BIOFerm had improperly installed the system (and the media)." (Dkt. #1, at ¶ 68.) Montauk alleges that BIOFerm systematically sought to prevent Carbotech's direct involvement, "treating its role as exclusive North American licensee as an obstructionist 'gatekeeper.'" (*Id.*) However, Montauk was able to secure Carbotech's assistance in properly replacing the media, resulting in charges for its work of more than $850,000. With the assistance from Carbotech, the plant was finally meeting performance requirements in September 2021. Montauk alleges that BIOFerm has not taken responsibility for failures under the contract, and that BIOFerm refused to recognize the plant's performance issues within the warranty period. Further, Montauk's complaint includes an October 8, 2021, letter from Carbotech that allegedly concludes BIOFerm failed to properly reinstall the media in April 2020. (Dkt. #1-11 (Ex I).)

The only cause of action at issue in BIOFerm's pending motion to dismiss is Count Six for breach of the DTPA. This count accuses BIOFerm of making "false, misleading and deceptive statements and representations for the purpose of deceiving the public" through the twelve statements relating to the Galveston project that follow:

    a. That the biogas conversion system it intended to provide would meet the promised performance specifications.

    b. That the biogas conversion system it intended to provide would result in cost savings.

    c. That the removal and reinstallation of the PSA media in April 2020 by BIOFerm was not only permissible but appropriate according to Carbotech.

    d. That BIOFerm or its subcontractors possessed the necessary skill and expertise to properly design, build, and commission the biogas conversion system.

    e. That BIOFerm and or its subcontractors would follow the specifications required by BIOFerm's design, including properly welding the bottom plates in the PSA vessels in the first instance.

    f. That BIOFerm or its subcontractors possessed the necessary skill, expertise, and equipment to allow them to remove and re-install the PSA media in the pressure vessels.

    g. That BIOFerm promised a turnkey system that was easy to install and therefore available within a short period of time.

    h. That BIOFerm's modifications to the design and or its failure to follow the specifications in the design were acceptable to Carbotech.

    i. That BIOFerm actually consulted and followed Carbotech's directions with respect to its attempts to reinstall and reuse the media, including when it failed to use all of the media originally supplied when it was re-used in April 2020.

    j. That BIOFerm's performance guarantee is the best in the industry, that it would be honored, and that it would not interfere with Galveston's attempts to seek additional resources (including from BIOFerm's alleged partner, Carbotech) in trying to not only meet performance testing guarantees and requirements but provide a Plant that was as promised.

    k. That installing the anchor bolts at a depth substantially less than the installation depth specified in the Contract was reasonable.

    l. That designing and building a pressurized system without a pressure relief valve was reasonable.

(Dkt. #1, at ¶ 117(a)–(l).)

## OPINION

BIOFerm argues there are two discrete reasons to dismiss Montauk's § 100.18 claim at the pleading stage. BIOFerm first alleges that all of Montauk's allegations fall outside

the scope of § 100.18 as time-barred, non-public statements or both. Alternatively, BIOFerm argues that none of the alleged statements in Montauk's claim satisfy the elements of § 100.18. As discussed below, this court will grant the motion to dismiss as to the first discrete reason, and will not need to address the second, alternative argument.

The statute prohibits a person or firm with intent to offer anything for sale or hire from making any representations to "the public" that are "untrue, deceptive or misleading." Wis. Stat. § 100.18(1). Because the statute provides a three-year statute of repose "after the occurrence of the unlawful act or practice," Wis. Stat. § 100.18(11)(b)3, a cause of action under § 100.18 accrues at the time of the false representation, not at the time of injury. *Kain v. Bluemound E. Indus. Park, Inc.*, 635 N.W.2d 640, 645 (Wis. Ct. App. 2001). A DTPA claim requires three elements: (1) a representation to the public with the intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation caused a pecuniary loss. *Prosynthesis Lab'ys, Inc. v. Eurofins Microbiology Lab'ys, Inc.*, No. 22-cv-655-slc, 2023 WL 3377494, at *5 (W.D. Wis. May 11, 2023).

I. Representations Made More Than Three Years Before Suit

BIOFerm argues that seven of the allegations in the complaint were barred by the statute of repose because on the face of the complaint more than three years had already passed between the "occurrence" of the alleged unlawful representations and Montauk filing the complaint, regardless of whether Montauk had discovered the injury or wrongdoing. (Dkt. #11, at 5–6 (citing *Kain*, 635 N.W.2d at 645).) Specifically, the complaint was filed on September 20, 2022, meaning that the critical date is September

7

20, 2019. However, Montauk alleges deceptive representations induced them to form the contract on April 17, 2018, each appears to be over four years before filing the complaint.

Nevertheless, Montauk argues that this case is "unique," because it was "impossible" for them to know of BIOFerm's fraudulent conduct within the three-year timeframe. (Dkt. #14, at 1, 5.) In particular, Montauk argues that BIOFerm created problems that it "fraudulently claimed it had the expertise to resolve." (*Id.* at 1–2.) However, Montauk fails to distinguish BIOFerm's argument and caselaw. (Dkt. #14 at 6.)

In *Kain*, the plaintiff argued the Wisconsin Legislature "could not have intended to protect false advertisers who could hide the falsity of their representations for more than three years." 635 N.W.2d at 645. However, the *Kain* court rejected that argument, explaining that a line of Wisconsin cases found limitation statutes to be the result of the legislature's policy considerations, and the language of § 100.18 is unambiguous: a cause of action accrues at the time of the false representation, not the injury. *Id.* (citing *Tomczak v. Bailey*, 578 N.W.2d 166, 170–71 (Wis. 1998)). Montauk argues the factual difference in *Kain* is that the plaintiff slept on his rights because the accused representations were about soil stability and could have been assessed to be false by investigation within the statutory period, but were not. In contrast, it asserts that false representations about BIOFerm's end product system and warranty could not have been known in time. (Dkt. #14, at 6.) Montauk does not point to anything in the statute's language or in *Kain* indicating that the running of the statute of repose turned on proof that the plaintiff slept on its rights. To the contrary, the *Kain* court resolved the case based on the statutory text of § 100.18 alone. 635 N.W.2d at 645 ("the legislature has already determined when the

claim 'accrues'—at the time of the defendant's action"). Thus, *Kain* is controlling here as well, and this court finds that all deceptive statements expressly alleged to have been made before the parties' formation of a contract are barred by the DTPA's statute of repose.

**II.     Representations Made After Montauk And BIOFerm Entered Into Their Contract**

BIOFerm further argues that any remaining allegations of Montauk's Count Six occurred after contract formation are barred by the "public" scope of the statute. (Dkt. #11, at 9.) As already noted, the statute prohibits untrue, deceptive, or misleading representations to "the public" only. Wis. Stat. § 100.18(1). Moreover, Wisconsin cases explain that by forming a contract, parties create a "particular relationship" and cease being members of the "public" for purposes of § 100.18(1). *Kailin v. Armstrong*, 643 N.W.2d 132, 149 (Wis. Ct. App. 2002); (dkt. #11, at 6.) BIOFerm argues that representations made after the contract's execution logically could not have *caused* Montauk to execute the contract. *Fricano v. Bank of Am. NA*, 875 N.W.2d 143, 153 (Wis. Ct. App. 2015); (dkt. #11, at 7.) On its face, since the representations were made after the parties entered into the contract, they, too, are not reached by the DTPA. *See* dkt. #1, at ¶ 117(c), (f), & (i), pertaining to reinstallation and reuse of the filtration media; *id.* (h) & (i), BIOFerm's discussions with Carbotech during the project commissioning; *id.* (j), regarding design of the system. (Dkt. #11, at 7–8.)

Montauk responds that BIOFerm's argument is overly simplistic. (Dkt. #14, at 9.) According to Montauk, the contract "by design, envisioned further negotiations between the parties as unforeseen issues arose." (*Id.*) Montauk further argues that its sixth cause

9

of action is based entirely on "evidence of a continuing fraud or a separate and distinct negotiation." (*Id.* at 12.) However, these arguments ignore that in either case the representations had been made *after* Montauk and BIOFerm had formed a "particular relationship" by entering into a contract, taking it outside the reach of § 100.18. *Kailin*, 643 N.W.2d at 149. As explained in *Kailin*, this is because DTPA's intent is to prevent fraudulent inducement causing members of the public to make a purchase or enter into a contract, which logically cannot occur due to statements "made by the seller after a person has made a purchase or entered into a contract." *Id.*; *see also Fricano*, 875 N.W.2d at 153 ("once a person has made a purchase or entered into a contract, any statements made thereafter cannot be said to have caused that person to make that purchase or enter into that contract.").

Montauk cites *La Crosse County v. Trinity Industries, Inc.*, No. 15-cv-117-jdp, 2016 WL 1274623 (W.D. Wis. Mar. 31, 2016), to argue it was unclear BIOFerm and Montauk had a contractual relationship, but the *La Crosse* court denied a motion to dismiss a DTPA claim because it *inferred* that the parties did not have an ongoing contractual relationship, and therefore, each of the induced purchases arose from separate contracts; thus, it could not definitively conclude the plaintiff was not a member of the public when the defendant made the allegedly false representations. *See id.*, at *8–9 (noting the parties had "not filed copies of their sales contract (or contracts)," nor had "they described the specifics of their contractual relationship"). Here, no such inference is possible since plaintiff expressly alleges that the alleged post-April 17, 2018, representations between Montauk and BIOFerm pertain to the subject of their original contract: the Galveston RNG project.

10

(Dkt. #1-4 (Ex. B).) Although Montauk proffers change orders and additional purchase orders the parties negotiated, (dkt. #1, at ¶¶ 45, 55; dkt. #1-7 (Ex. E); dkt. #1-8 (Ex. F)), and alleges that the parties' relationship was not "irrevocably and immutably defined after formation" of the original contract, (dkt. #14, at 11), that evidence all pertains to the Galveston RNG project, decidedly *not* public misrepresentations. Indeed, the *La Crosse* court itself held DTPA claims may not proceed on "representations about the subject of the contract" already in effect. 2016 WL 1274623, at *9.

      Finally, Montauk argues that fraudulent representations made outside the three-year statute of repose may be actionable if part of a "continuing fraud," citing *Werner v. Pittway Corp.*, 90 F. Supp. 2d 1018 (W.D. Wis. 2000), and *Northcentral Tech. Coll. v. Doron Precision Sys., Inc.*, No. 13-cv-425-slc, 2013 WL 5719459 (W.D. Wis. Oct. 21, 2013), but the application of that theory is misplaced here. (Dkt. #14, at 7–8 & n.1.) In *Werner*, the DTPA claimants had purchased or received defective smoke alarms more than three years before their complaint was filed. 90 F. Supp. 2d at 1033. In *dicta,* the *Werner* opinion suggested that plaintiffs' claims could have survived § 100.18(11)(b)3's three-year period under a "continuing tort" theory by showing defendants had engaged in a continuing course of misconduct *and* that at least one of their acts fell inside the three-year period. *Id.* For example, a misleading public advertisement might have been an act inside the three-year statute of repose that caused the plaintiffs to keep defendants' detectors in their home, instead of replacing them with another manufacturer's. However, this possibility is again of no use to Montauk, since there is *no* indication in *Werner* that the plaintiffs were in any "particular relationship" with the smoke alarm manufacturer inside the three-year period.

11

To the contrary, the entire premise of the *Werner* "exception" is that plaintiffs continued to get their information through the defendant's public communications. Thus, nothing in *Werner dicta* or otherwise, is contrary to the controlling principle under Wisconsin law that a DTPA claim must satisfy every DTPA element -- including that the accused representations must be made to "the public." Wis. Stat. § 100.18(1); *Prosynthesis*, 2023 WL 3377494, at *5. Unfortunately for Montauk, its own complaint pleads it out of a DTPA claim with respect to any post-contract communications between the parties.

The *Northcentral* opinion does not support Montauk's continuing fraud theory either. As here, the DTPA claimants formed a contract with defendant more than three years before the complaint was filed. 2013 WL 5719459, at *3. Also as here, the *Northcentral* claimants cited to *Werner* in alleging that defendant "continued to violate the act during the three-year repose period." *Id.* However, *Northcentral* held that mere allegation alone was insufficient to state a DTPA claim without an additional showing under § 100.18 that defendant made a deceptive "representation to *the public* during that time." *Id.* (granting motion to dismiss DTPA claim). And, again, Montauk pleads the opposite. Indeed, Montauk not only fails to plead anything about misleading advertisements or other deceptive representation to the public relied upon after the parties' original contract, but instead relies upon an April 2020 *internal* memo from BIOFerm *to Montauk*, marked confidential and pertaining to BIOFerm's recommendations on dealing with the media reinstallation as containing the deceptive representation within the three-year period. (Dkt. #14-1, at 3–4 (citing dkt. #1-9 (Ex. G)).) Thus, considering the applicable law and the alleged facts, this court concludes that Montauk was not a member

12

of the public but had a particular relationship with BIOFerm after the contract was executed on April 17, 2018, and no reasonable jury could make a conflicting inference or finding.

Accordingly, all of Montauk's alleged misrepresentations are either-time barred or otherwise outside the scope of § 100.18 when made.

### III. Untrue, Deceptive, or Misleading Representations

In the alternative, BIOFerm argues dismissal of Count Six is appropriate because all of the statements alleged in the complaint were "non-falsifiable," mere puffery, or not "untrue, deceptive or misleading" within the meaning of Wis. Stat. § 100.18(1). (Dkt. #11, at 10–11.) In response, Montauk argues that the statements BIOFerm made are plausibly within the ambit of the DTPA (dkt. #14, at 13–14), citing *United Concrete & Constr., Inc. v. Red-D-Mix Concrete, Inc.*, 836 N.W.2d 807, 820 (Wis. 2013), where the Wisconsin Supreme Court remanded for submission to a jury an arguable puffery question as ordinarily a fact question. Although this court does not need to decide the issue, having already found the DTPA claim otherwise falls outside the reach of § 100.18, it would be remiss not to point out the glaring problem: most, if not all, of the allegedly deceptive statements are forward looking and aspirational, which would only be actionable if Montauk could prove BIOFerm *knew* those statements were false when made. *Crawford v. Am. Home Mortg. Servicing, Inc.*, No. 10-cv-198-wmc, 2012 WL 12995303, at *18–19 (W.D. Wis. Mar. 19, 2012).

13

IV. **Alternative Motion for Leave**

Finally, Montauk argues that if this court determines its allegations are barred as pleaded under § 100.18, this court should grant them leave to conduct further discovery and amend their complaint. (Dkt. #14, at 15–16.) This is wholly unnecessary since discovery is already open and plaintiff may seek leave to amend at any time. However, Montauk does not suggest nor can the court conceive of what might be unearthed that could recharacterize private statements into public ones. Moreover, BIOFerm's motion to dismiss has been pending for approximately ten months, and Montauk has not been precluded from taking discovery or amending their pleadings on the issue. As a result, any further delay in seeking leave to amend is unlikely to be favorably received. Regardless, this court notes that this decision should not be interpreted as ruling on Montauk's other causes of action (none of which BIOFerm sought to dismiss). Montauk's averment that "BIOFerm failed to honor its warranty and exacerbated its failure with the botched media refill in 2020," (dkt. #14, at 16), is not without potential recourse through the other counts in the complaint.

ORDER

IT IS ORDERED that BIOFerm's motion to dismiss the Sixth Cause of Action in Montauk's complaint (dkt. #10) is GRANTED.

Entered this 21st day of August, 2023.

BY THE COURT:
/s/

_____
WILLIAM M. CONLEY
District Judge